UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Larry Hudson | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 17 CV 50033 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting Commissioner of Social Security,[1] | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff is a 56-year-old veteran who last worked full-time in 2008 doing maintenance at a public housing project. Since he stopped working, plaintiff has filed multiple disability applications, but he has so far has been unsuccessful. On three occasions (in April 2011, January 2013, and October 2015), an administrative law judge ("ALJ") has held that plaintiff's orthopedic-related problems and other problems (obesity, diabetes, and high blood pressure) would not prevent him from working. Plaintiff chose not to appeal the first two decisions to this Court, but instead, each time, filed a new disability application, which then re-started a new round of hearings and decisions. This time he chose to file an appeal.[2]

Plaintiff's argument for a remand is limited to one medical condition—neuropathy caused by his diabetes. Plaintiff alleges that the neuropathy causes a burning sensation in his feet, occurring mostly in the early morning. In this appeal, plaintiff does not raise any arguments directed at the ALJ's analysis of plaintiff's orthopedic problems, or his obesity, or his high blood pressure. Plaintiff agrees that the prior ALJ, in his 2013 decision, fully considered these

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] Plaintiff has been represented by counsel throughout all these proceedings.

1

impairments and that these impairments have not changed in any material way since then. However, the diabetic neuropathy allegedly had a different time progression. According to plaintiff, this condition was "just emerging" in January 2013 when the prior ALJ issued his decision and also when the medical expert testified at the second administrative hearing. The medical expert's role at the prior hearing is a critical part of plaintiff's argument because no expert testified at the 2015 hearing.

The heart of the dispute is whether the neuropathy worsened. The ALJ found that it did not. Plaintiff argues that the ALJ reached this conclusion by "playing doctor" and should have called a medical expert. Although this Court agrees that the ALJ's decision would rest on firmer grounds if an expert had testified, the Court finds that the ALJ's decision still should be affirmed.

**BACKGROUND**

The Court will summarize the highlights of the three administrative proceedings because they provide context. The first hearing was held in March 2011. Dr. Hilda Martin was called as an impartial medical expert. She testified that plaintiff had "mild osteoarthritis of his lumbar spine" and noted, among other things, that an X-ray and a physical exam showed "very mild degenerative arthritis" with "minimal to no objective findings." R. 113-14. As for plaintiff's diabetes, she stated that plaintiff "had normal monofilament testing bilaterally which means that he doesn't have any neuropathy." R. 116. Dr. Martin also noted that there were "several times" when plaintiff had reported not taking his medications and that he had "missed many appointments" at the Veterans Administration ("VA"), where all of his medical care was rendered. *Id.* In her proposed residual function capacity (RFC) finding, Dr. Martin found that plaintiff could lift 50 pounds occasionally, 25 pounds frequently, and could stand, walk, and sit for six hours. R. 118.

Relying on this testimony, the ALJ adopted this RFC formulation in the written decision. R. 135. The ALJ noted that plaintiff had "not been entirely compliant in taking prescribed medications and following the recommended diet for his diabetes, which suggests that the symptoms may not have been as limiting as the claimant has alleged." R. 136.

The ALJ's decision was issued on April 26, 2011. The next month, on May 20, 2011, plaintiff filed a new disability application. A second hearing before the same ALJ was held on January 3, 2013. This time Dr. Charles Metcalf testified as the expert. He opined that plaintiff's back problem was a "mechanical back problem," which meant that it was "not due to a disk" but instead was caused by the fact that plaintiff's "back muscle, ligaments, supporting structures and so forth, just don't hold up well and then he gets the pain because of a lot of positional and conditioning, and so forth." R. 76. Dr. Metcalf stated that this caused plaintiff's doctors to recommend that he be put in an educational class "to help him learn how to use his back better." *Id.* As for plaintiff's diabetes, Dr. Metcalf stated the following:

> He does have diabetes; not under good control but not terrible. It's not good but it's not terrible. His A1C run low eights, 8.2, 8.3, the last two years. He's not on insulin—metformin and glipizide but he does have peripheral neuropathy diagnosed with that and they verify that, not just by his symptoms; stinging and tingling in the feet, but also he has absence of the deep tendon reflexes of the ankle; however, you can have that without neuropathy, but it's confirmatory a little bit. And he does have increased senses; apparently characteristic of peripheral neuropathy and the diabetes, so he has that to the lower extremity. The Diabetic Clinic, in May 2012, said he used to have this tingling and pain in the feet intermittently but, in the last couple months, it's got to be steady; more constant. He does also have some problem with knees; not much mention. He did have an X-ray in 2010 that he has some, at least moderate, degenerative disease and, just with his weight, his BMI is 35.1. He's 5'7", 224 pounds, on one observation so he has significant obesity but not morbid obesity. That—I think *those three problems—the muscular back problem, the diabetes with the peripheral neuropathy, obesity*, you know, probably some degenerative joint disease in the knees. All of these are *significant* conditions[.]

3

R. 77-78 (emphasis added). Dr. Metcalf concluded that plaintiff could do light work, but also recommended that a sit-stand option be included in the RFC to accommodate plaintiff's "neuropathy and [] back problem." R. 80.

Plaintiff's counsel later cross-examined Dr. Metcalf. As part of this questioning, counsel asked the following questions, which plaintiff now relies on to cast doubt on Dr. Metcalf's opinion:

> Q  Okay. You noted that you believe Mr. Hudson could sit for six hours in a workday; you feel he could walk around for six hours in a workday?
>
> A  I don't see anything, physically, in his record that would prevent it.
>
> Q  Is it possible the peripheral neuropathy would prevent it?
>
> A  Yes. It's quite possible.
>
> Q  Okay.
>
> A  I didn't see anything in the record that would substantiate it.

R. 95.

On January 25, 2013, the ALJ again found plaintiff not disabled. The ALJ's decision rested heavily on the fact that plaintiff was "very non-compliant" in following doctor recommendations and that, as a result, his diabetes was "poorly controlled." R. 177-178.

On February 25, 2013, plaintiff filed another disability application. A third hearing was held on June 26, 2015. A new ALJ was assigned to the case. The hearing began with the following exchange:

> ALJ:  []  Mr. Hudson filed the SSI application, that's in front of me, on February 25th, 2013; about a month after [the] last ALJ decision found that he could perform light work. So we're here today to figure out [] what, if anything, has changed since that last decision and if the Claimant has become limited to sedentary work in the interim.
>
> ATTY:  That's correct.

ALJ: Okay. So we're here, on June 26, 2015; I'm Judge Michaelson. With me here is Lee Knutson, who is going to help me out as a vocational expert. Dr. Jilhewar, who was supposed to be here as a medical expert, is not able to appear today. So, we are going to go without a medical expert, unless you have an objection to that?

ATTY: No. That's fine.

R. 32.

Most of the hearing was taken up with the ALJ's questioning of plaintiff. She asked him why he did not take better care of himself and why he did not follow numerous treatment recommendations. She asked why he failed to regularly take his medication, to exercise, to regularly show up for doctor appointments, to consistently use his TENS unit, to drink less alcohol, to stop smoking, and to eat a healthy diet. These questions were, at times, long and sometimes masqueraded as mini health lectures.[3] Plaintiff gave various answers that the ALJ later found unpersuasive. To give one example, the ALJ repeatedly asked why plaintiff did not avail himself of various exercise opportunities, including participating in the VA's Move Program, which his doctors repeatedly urged him to do; doing simple exercises in his home such as stretching before getting out of bed; exercising at the workout room in his apartment building; or going to the local YMCA, which plaintiff's doctor advised him to do. R. 49-53. In response to questions about exercising at his apartment building facility, plaintiff initially stated that the

---

[3] As an example, here is one question the ALJ asked toward the end of the examination: "Okay. The other thing you can do—medication, diet—and the third thing you can do to control your diabetes is exercise. So, *I'm going to say it for about the hundredth time.* Anything from gentle stretches to real exercise, going to this Move Program, going—walking around the block three times a day, any kind of exercise, is going to help your diabetes. Okay? Because it's going to help your weight. [] I mean, if you're serious about getting your diabetes under control, which might let you then have the surgery for your lipoma, which might stop the progression of the burning in your feet and exercise will also help your back and your knees. [] Okay? So, are you wearing the shoes that they prescribed for you?" R. 55-56 (emphasis added and two nod-your-head "okays" uttered by plaintiff were omitted). This Court agrees with plaintiff's complaint that some of this commentary, while likely well-intentioned, strayed from the ALJ's role as a neutral fact-finder. The ALJ is to determine disability, not to audition for *Dr. Oz*. This style of questioning potentially opens the ALJ up to the criticism, made by plaintiff in his briefs, that the ALJ was playing doctor. However, for the reasons stated below, the Court finds that the ALJ's decision did not cross this line given all the facts and circumstances of this case. Also, plaintiff's counsel asked plaintiff questions as well, thus providing him the opportunity to provide an explanation.

5

equipment was broken for a while, but then he stated that not all the equipment was broken and then stated that it had been fixed anyway and that he still didn't go because he didn't find it "up to par." R. 58-59.

As for his neuropathy-related symptoms, plaintiff testified that he had a burning sensation in his feet that primarily affected him when he first woke up. *See* R. 42 ("when I wake up or try to get up, my feet burns at the bottom"). He stated that this burning sensation happened two or three mornings a week. *Id.* Plaintiff testified that he took Gabapentin for this pain, but did not take it every day. The ALJ stated that plaintiff should take this medication every day. R. 44 ("if you took it every day, like you're supposed to, maybe that would make the pain never start.").

On October 6, 2015, the ALJ issued her decision finding that plaintiff could do light work. The ALJ noted that much of the medical evidence had already been considered by the prior ALJ in 2013, and that the prior summary of the evidence was incorporated by reference. The ALJ concluded that "overall, the medical evidence, although voluminous, fails to establish more serious limitations or general worsening since the last decision." R. 21. In short, she rejected plaintiff's progressive worsening thesis. However, to account for some possible worsening in plaintiff's feet caused by the neuropathy, the ALJ included a restriction in the RFC that plaintiff "needs to change position for 1-2 minutes every half hour." R. 17. The main rationale in the decision was that plaintiff had been non-compliant. The ALJ stated as follows:

> In general, the treatment notes are riddled with references to the claimant's non-compliance with medications and general lack of motivation to undertake actions to improve his health. It is quite possible that the claimant's blood sugar levels would diminish significantly were he to follow his doctors' recommendations. His failure to take his medications as prescribed, watch his diet more carefully, and take other recommendations by his doctors more seriously suggests that his limitations might not have been as limiting as he reports.

R. 21. In addition, the ALJ also noted that plaintiff's daily activities and work history supported the credibility finding.

## DISCUSSION

As noted above, plaintiff's argument rests on the factual premise that his diabetic neuropathy was only vaguely present before the 2013 hearing, but then, seemingly fairly suddenly, became more pronounced thereafter. This premise is important because plaintiff believes that it knocks out Dr. Metcalf's 2013 opinion as support for the ALJ's decision. Without that opinion, the ALJ then (according to plaintiff) must have been "playing doctor" when analyzing the neuropathy-related evidence from 2013 to 2015. The Court is not persuaded by this argument because it rests on a cherry-picked view of the medical record.

As an initial point, it is worth noting that the ALJ called a medical expert (Dr. Jilhewar) to testify at the 2015 hearing, but Dr. Jilhewar did not appear for some reason. This fact arguably suggests that the ALJ believed, at least initially, that a medical expert should be called. The ALJ then asked plaintiff's counsel whether he still wanted to proceed without an expert. Counsel stated that he did. The Government has not raised any waiver argument here, and this Court is not aware of any basis under existing rules for finding a waiver, even though this Court believes that it would both be fair and efficient to allow for a waiver argument to be made under these circumstances. However, the Court does note that counsel's willingness to proceed without an expert shows that counsel did not see a glaring need for an expert at the start of the hearing. Moreover, at the end of the hearing, counsel did not change his mind and ask for a medical expert, nor did counsel later submit a letter brief after the hearing, but before the ALJ issued the decision, making such a request.

Turning back to plaintiff's argument, plaintiff relies on the following actions that he claims took place after January 3, 2013: plaintiff was first "officially diagnosed" with neuropathy; he went to the VA on "multiple occasions" to complain about his neuropathy; he "frequently received shoe inserts"; and his doctors prescribed Gabapentin to help with the burning sensation in his feet. Dkt. #12 at 2, 4. The clear suggestion is that there was a noticeable increase in intensity of plaintiff's neuropathy symptoms after January 2013.

One problem with this argument is that no comparison is made to the period before the hearing. For example, plaintiff claims there were "multiple" visits to the doctor after the 2013 hearing, but the same claim could be made about the year *before* the hearing. Specifically, plaintiff's neuropathy was discussed in at least five medical visits in 2012. It is not clear that this frequency of visits differed any from the frequency after January 2013, and plaintiff has not specifically claimed that there was any increase.

Moreover, these five pre-2013 medical visits provide evidence undermining a number of plaintiff's contentions. The following observations and findings were made:

- On May 2nd, Dr. Jenny Liao, in the pain clinic, noted that plaintiff was complaining of "numbness, tingling, and burning pain in his feet that *has been more constant* for the past several months but was intermittent prior." R. 573 (emphasis added). On examination, she found that his deep tendon reflexes were "absent at the ankles" and stated that he had a "distal polyneuropathy likely related to diabetes." R. 574.

- Also on May 2nd, Dr. Ebert, in the orthopedic clinic, examined plaintiff and noted that he "may be developing a mild diabetic neuropathy." R. 572.

- On August 29th, plaintiff complained about a "burning pain from feet/ankle to leg with first ambulation in the morning." R. 377. The doctor noted that plaintiff had diminished sensation on monofilament testing of the bilateral feet, assessed him with "neuropathy," and "discussed shoegear." R. 377-78.

- On October 22, 2012, plaintiff was seen for "burning feet/ankles which has gotten worse since last visit." R. 372. On this visit, the monofilament test was positive. The podiatrist also discussed "diabetic shoes/inserts." R. 373.

8

- On November 26th, plaintiff again complained about a burning sensation in his feet, but the medical notes referred to his description of the pain as being "vague." R. 366. A monofilament test was performed, with positive results to some degree. R. 367. The notes also indicated that plaintiff made the following request: "Has a lawyer and [is] wondering if he can get something today for his lawyer to say that he needs shoes due to his diabetes." R. 366.

Contrary to plaintiff's suggestion that he was first diagnosed with neuropathy only after the hearing, this evidence disputes that claim. This evidence also is inconsistent with the suggestion that the neuropathy was hidden before the hearing. This evidence shows that that plaintiff repeatedly complained about it, and that his doctors performed diagnostic tests to evaluate it and also discussed shoe inserts.

In addition, this evidence shows that Dr. Metcalf had an evidentiary basis for rendering his opinion about the neuropathy. As summarized above, Dr. Metcalf identified the neuropathy as one of the three "significant" problems then facing plaintiff. This, again, shows the problem was not overlooked. Dr. Metcalf also noted that plaintiff initially described the problem as being intermittent but then stated that it was more constant. Plaintiff overlooks this testimony and instead focuses on one later portion of the cross-examination and tries to build an argument out of Dr. Metcalf's bland concession that it was "possible" that plaintiff's neuropathy could later become more severe. But this vague answer was not offered as a prediction.

Another weakness in plaintiff's argument is that it similarly relies on "doctor playing." Plaintiff's counsel has dug through the post-hearing evidence and extracted favorable snippets and observations, meant to suggest that plaintiff's neuropathy was severe, but plaintiff's arguments are not supported by any medical expert opinion. Notably, as the ALJ stated, none of plaintiff's doctors provided an opinion suggesting that plaintiff could not work. R. 23. This lack of any supporting medical opinion is a fact that the ALJ could rely on. *See Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010) (affirming the ALJ's decision and noting with approval: "The ALJ

9

found it illuminating and persuasive on its face that none of Castile's doctors opined that she was unable to work."). The ALJ also noted that plaintiff's doctors' advice to exercise showed that they believed that "he is capable of exercising." R. 22. As for plaintiff's reliance on the fact that he went to the VA to get shoe inserts or diabetic shoes (it's not clear whether these are different things), plaintiff has not provided any medical authority to support the implied inference, which is that wearing diabetic shoes was inconsistent with light work or, more generally, was a telling indicator about the severity of his condition.

As the ALJ recognized, the post-January-2013 evidence was not overwhelming and, therefore, did not support plaintiff's argument that his condition significantly worsened. (Again, this is one reasonable interpretation that could be drawn.) To cite one example, at the September 10, 2013 visit, plaintiff had a normal monofilament exam. R. 446. This cuts against plaintiff's deterioration thesis in that he had some positive monofilament tests earlier, as well as some later.[4] Another telling piece of evidence was the October 22, 2014 visit with Dr. Ebert. In her decision, the ALJ summarized at length Dr. Ebert's notes from this visit. These notes provide substantial evidence for the ALJ's decision. Importantly, Dr. Ebert compared plaintiff's current condition to his condition in May 2012. Dr. Ebert noted that plaintiff stated that, "[i]n terms of symptoms nothing much has changed," with the possible exception of "some progressive numbness in both lower extremities consistent with his diabetic neuropathy." R. 604. After examining plaintiff and performing tests, Dr. Ebert stated as follows: "Overall a very negative exam except for the distal sensory changes consistent with his polyneuropathy." R. 604-05. He

---

[4] As the Seventh Circuit discussed in *Engstrand v. Colvin*, 788 F.3d 655, 661-62 7th Cir. 2015), the monofilament test is not a bright-line or perfect diagnostic tool. The Seventh Circuit stated that the test "is used to determine whether a person has neuropathy so severe as to cause an ulcer or gangrene," and it "does not measure pain." *Id.* at 660. It is important to keep in mind that the ALJ was focusing on whether there had been a significant worsening of plaintiff's neuropathy since Dr. Metcalf rendered his opinion, and was not engaging in a blank slate analysis on her own. The critical issue was comparing plaintiff's condition before 2013 to his condition in 2015.

10

then recommended that plaintiff exercise and advised him to try the local YMCA. A comparison of the physical examination findings Dr. Ebert made at the May 2, 2012 visit to those he made at the October 22, 2014 visit shows little difference. *Cf.* R. 605 *to* R. 572.

The broader problem with plaintiff's "playing doctor" argument is that, at best, it only goes to the ALJ's analysis of the objective medical evidence. But the ALJ agreed that plaintiff had diabetic neuropathy and that it caused some pain. The crux of the decision was the credibility analysis, and the key rationale there was non-compliance. Under SSR 96-7p, an ALJ may conclude that a claimant's pain allegations are not credible "if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." Plaintiff concedes that the ALJ was permitted to consider his non-compliance, and that the ALJ stated that she viewed this as the "most important factor." R. 21. Plaintiff also agrees, at least to some degree, with the factual conclusion that he failed to follow doctor's treatment recommendations. *See* Dkt. #12 at 6 (recognizing that his "compliance has not been perfect"). Plaintiff also does not argue that did not receive medical care. As the ALJ stated, "access to health care is not an issue [because] the claimant receives his care through the VA medical system and the voluminous records attest that he in fact receives adequate care." R. 23.

Plaintiff's main argument against the non-compliance rationale is his assertion that he was "not well-versed in medical terminology, practices, or procedures." Dkt. #12 at 6. Plaintiff does not provide any legal authority to support this argument. To the extent that this argument is even viable, this case is not a convincing candidate for its application. Most of the recommendations from plaintiff's doctors were commonsense recommendations, such as exercising and eating a healthy diet, that are not difficult to understand. Plaintiff has not argued that he suffers from any cognitive impairment or psychiatric condition that would make it

11

difficult for him to take steps to try and control his diabetes, just as millions of others do. *See Brown v. Berryhill*, 2018 WL 1635848, *5 (N.D. Ill. April 2, 2018) (rejecting the premise that a single mother, with a 10th grade education, and limited financial resources "could not realistically follow well-accepted diabetes treatment recommendations"). Moreover, the record contains numerous statements that VA personnel spent time instructing plaintiff about how to take care of his diabetes. *See, e.g.*, R. 367. Also, to the extent that plaintiff did not understand the importance of following doctors' recommendations, the first two ALJ decisions should have made that fact even more apparent.

Plaintiff's other argument directed at the non-compliance rationale is his assertion that the neuropathy damage may have been permanent and irreversible. This argument relies mostly on one comment made by a VA resident who stated, at a January 4, 2013 visit, that "some level of nerve damage has likely been done." R. 364. Relatedly, plaintiff argues that "[t]here is no indication whatsoever that the numbness in his legs and feet would *improve* if he was taking Gabapentin regularly." Dkt. #12 at 6 (emphasis added). There are two main problems with this argument. One is that plaintiff's doctors never stated that the treatment would not work, and they kept advising plaintiff to take various steps to keep the diabetes under control. For example, the VA resident who made the comment about there possibly being "some" nerve damage still told plaintiff to take "aggressive diabetic control" to avoid any possible further progression of this problem. R. 364. In sum, the ALJ could draw an inference that the doctors continued to make these treatment recommendations because they believed they would help.

The second problem with this line of argument is that the ALJ's decision did not rest on the conclusion that plaintiff had never had any problems with neuropathy, but simply that those problems could be managed so that plaintiff could work. For example, although pain medication may not reverse the underlying damage, it may allow plaintiff to work. Also, it is important to remember that plaintiff's testimony at the 2015 hearing was that the neuropathy pain affected him mostly early in the morning and that, even then, it was only two to three mornings a week. In other words, on the other four to five days in the week, plaintiff had no neuropathic pain at all.

In addition to his arguments directed at the non-compliance rationale, plaintiff also briefly argues, in his reply brief, that the ALJ improperly relied on plaintiff's daily activities as a separate rationale supporting the credibility judgment. It is true that the ALJ cited to plaintiff's "fairly full" slate of daily activities as an additional rationale, along with plaintiff's poor work history (this latter rationale has not been challenged by plaintiff). Plaintiff argues that his activities were not of the type to justify an inference that he could stand or walk six hours a day. Although the ALJ did not make such a straight-line conclusion, the Court agrees that this particular rationale was not compelling. But the Court finds that any possible error was harmless given that this rationale was clearly subordinate to the dominant non-compliance rationale.

The ALJ's analysis consisted of the following:

> [C]laimant's activities of daily living do not appear to be as seriously limited as one would expect if an individual was as limited as he alleges. He is fully independent in carrying out his activities of daily living. He has reported ironing, doing laundry, going outside 3-4 times each week, and using public transportation. The claimant lives alone and has not reported receiving any specific help on a day to day basis. He goes grocery shopping monthly without assistance. He goes to church at times. He reads the Bible and goes to Bible study classes and/or bingo games two or three times a week, although he testified that some of these activities are in his building. He makes it to medical appointments. Thus, he engages in relatively full and normal activities despite his allegations of severe back, knee and foot pain. These activities obviously are not the equivalent of full time work, but undermine his allegations of serious limitations on his ability to stand and walk.

13

R. 22. Plaintiff asserts that it was not probative that he "was able to complete some (mostly sedentary) daily activities (e.g. Bible study and bingo)." Dkt. #16 at 1. Not surprisingly, plaintiff's Bible-and-bingo argument accentuates the least vigorous activities. The ALJ would surely counter that other activities, such as taking public transportation three to four times a week, suggest a more active lifestyle. Still, on balance, the Court finds that these activities, at best, provide little insight one way or another. Moreover, the ALJ's reliance on them is confusing because the assertion that plaintiff led a fairly active lifestyle runs counter to the premise behind the non-compliance rationale—namely, that plaintiff led a sedentary life. *See, e.g.*, R. 605 (Dr. Ebert stating in October 2014 that plaintiff led "a very sedentary lifestyle"). Despite these concerns, the Court finds that this one rationale was not given undue weight. *See Jones v. Astrue*, 623 F.3d 1155, 1161-62 (7th Cir. 2010) (affirming the ALJ's credibility analysis even though the ALJ made some factual errors and even though the ALJ's reliance on the daily activities was not a compelling argument).

In sum, the Court finds that the ALJ's non-compliance rationale is supported by substantial evidence, including multiple statements from plaintiff's treating doctors, and that this rationale is sufficient to support the ALJ's larger RFC conclusion. *See, e.g., Castile*, 617 F.3d at 930 (affirming the ALJ's credibility finding where, among other things, the ALJ "found it particularly instructive that [the claimant] either refused or utterly failed to adhere to treatment programs prescribed by her physicians," which included exercising and losing weight). Stated differently, the Court does not find that the ALJ's credibility determination was "patently wrong." *Sawyer v. Colvin*, 512 F.3d 603, 607 (7th Cir. 2013).

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the decision of the ALJ is affirmed.

Date: May 25, 2018　　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge